Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Timothy J. Ohms
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

**Feb 08, 2022**

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 2:21-CR-0093-RMP |
| v. | Plea Agreement |
| KIMBERLY ANN BRISCHLE, | Fed. R. Crim. P. 11(c)(1)(C) |
| Defendant. | |

Plaintiff, United States of America, by and through Vanessa R. Waldref, United States Attorney, for the Eastern District of Washington, and Timothy J. Ohms, Assistant United States Attorney for the Eastern District of Washington, and KIMBERLY ANN BRISCHLE, ("Defendant"), both individually and by and through Defendant's counsel, Amy H. Rubin, agree to the following Plea Agreement:

    1.   <u>Guilty Plea and Maximum Statutory Penalties</u>:

Defendant KIMBERLY ANN BRISCHLE agrees to plead guilty to Counts 1 and 2 of the Superseding Indictment filed on Septrember 21, 2021, charging Defendant with Cyberstalking, in violation of 18 U.S.C. § 2261A(2)(A), (B) (Count 1), and Interstate Stalking, in violation of 18 U.S.C. § 2261A(1)(A), (B) (Count 2).

Defendant understands that the charges contained in Counts 1 and 2 of the Superseding Indictment are Class C felonies and that the maximum statutory penalty for Cyberstalking, in violation of 18 U.S.C. § 2261A(2)(A), (B) (Count 1), is a term of

imprisonment of not more than 5 years; a fine not to exceed $250,000; a term of supervised release of not more than 3 years; and a $100 special penalty assessment; and that the maximum statutory penalty for Interstate Stalking, in violation of 18 U.S.C. § 2261A(1)(A), (B) (Count 2), is a term of imprisonment of not more than 5 years; a fine not to exceed $250,000; a term of supervised release of not more than 3 years; and a $100 special penalty assessment.

Defendant understands that the Court has the authority to impose consecutive sentences for each conviction, which sentences Defendant would have to serve one after the other.

Defendant understands that a violation of a condition of supervised release carries an additional penalty of re-imprisonment for all or part of the term of supervised release without credit for time previously served on post-release supervision.

2.    The Court is Not a Party to the Agreement:

The Court is not a party to this Plea Agreement and may accept or reject this Plea Agreement. Sentencing is a matter that is solely within the discretion of the Court. Defendant understands that the Court is under no obligation to accept any recommendations made by the United States and/or by Defendant; that the Court will obtain an independent report and sentencing recommendation from the U.S. Probation Office; and that the Court may, in its discretion, impose any sentence it deems appropriate up to the statutory maximums stated in this Plea Agreement.

Defendant acknowledges that no promises of any type have been made to Defendant with respect to the sentence the Court will impose in this matter. Defendant understands that the Court is required to consider the applicable sentencing guideline range but may depart upward or downward under the appropriate circumstances.

Defendant understands that this Plea Agreement contains a joint sentencing recommendation pursuant to Fed. R. Crim. P. 11(c)(1)(C). As a result, the United

1  States may withdraw from this Plea Agreement if the Court imposes a lesser sentence
2  than agreed upon, and Defendant may withdraw from this Plea Agreement if the Court
3  imposes a harsher sentence than agreed upon.

4      3.    Effect on Immigration Status:

5  Defendant recognizes that pleading guilty may have consequences with respect
6  to Defendant's immigration status if Defendant is not a citizen of the United States.

7  Under federal law, a broad range of crimes are removable offenses, including
8  potentially, the offenses to which Defendant is pleading guilty. Removal and other
9  immigration consequences are the subject of a separate proceeding, however, and
10 Defendant understands that while deportation and/or removal appears to be a virtual
11 certainty, no one, including Defendant's attorney or the district court, can predict with
12 absolute certainty the effect of Defendant's conviction on Defendant's immigration
13 status. Defendant nevertheless affirms that Defendant wants to plead guilty regardless
14 of any immigration consequences that Defendant's plea may entail, even if automatic
15 removal from the United States is a virtual certainty.

16     4.    Waiver of Constitutional Rights:

17 Defendant understands that by entering this plea of guilty Defendant is
18 knowingly and voluntarily waiving certain constitutional rights, including:

19      (a)    The right to a jury trial;

20      (b)    The right to see, hear and question the witnesses;

21      (c)    The right to remain silent at trial;

22      (d)    The right to testify at trial; and

23      (e)    The right to compel witnesses to testify.

24 While Defendant is waiving certain constitutional rights, Defendant understands
25 Defendant retains the right to be assisted through the sentencing and any direct appeal
26 of the conviction and sentence by an attorney, who will be appointed at no cost if
27 Defendant cannot afford to hire an attorney. Defendant also acknowledges that any
28 pretrial motions currently pending before the Court are waived.

Plea Agreement - 3

5.    <u>Elements of the Offense</u>:

<u>COUNT 1</u>: The United States and the Defendant agree that in order to convict the Defendant of Cyberstalking, in violation of 18 U.S.C. § 2261A(2)(A), (B) (Count 1), the United States would have to prove beyond a reasonable doubt the following elements:

*First*, by April 27, 2021, and continuing until on or about July 20, 2021, in the Eastern District of Washington, the Defendant knowingly used facilities of interstate or foreign commerce to engage in a course of conduct that placed W.B. in reasonable fear of death or serious bodily injury to W.B. or to a pet of W.B. or that was reasonably expected to cause substantial emotional distress to W.B.; and

*Second*, the Defendant acted with the intent to injure, harass, or intimidate W.B.

<u>COUNT 2</u>: The United States and Defendant agree that, in order to convict Defendant of Interstate Stalking, in violation of 18 U.S.C. § 2261A(1)(A), (B) (Count 2), the United States would have to prove beyond a reasonable doubt the following elements:

*First*, on or about April 28, 2021, in the Eastern District of Washington, Defendant knowingly traveled in interstate commerce;

*Second*, in the course of such travel, Defendant engaged in conduct that placed W.B. in reasonable fear of death or serious bodily injury to W.B. or to a pet of W.B. or that was reasonably expected to cause substantial emotional distress to W.B.; and,

*Third,* the Defendant acted with the intent to injure, harass, or intimidate W.B.

6.    <u>Factual Basis and Statement of Facts</u>:

The United States and Defendant stipulate and agree that the following facts are accurate; that the United States could prove these facts beyond a reasonable doubt at

1  trial; and these facts constitute an adequate factual basis for Defendant's guilty plea

2  and stipulations relevant to the Guideline computation set forth in this Plea

3  Agreement.  This statement of facts does not preclude either party from presenting and

4  arguing, for sentencing purposes, additional facts which are relevant to the Guideline

5  computation or sentencing, unless otherwise prohibited in this agreement.

6          At 10:00 am on April 28, 2021, a neighbor reported a residential fire at 3111 E.

7  44th Avenue in Spokane, Washington. The fire department responded and found a fire

8  in the west bedroom walk-in closet and in the crawlspace below the closet where the

9  fire had burned through the floor. The fire department determined that no one was

10 present in the residence and extinguished the fire. In addition to the fire, firefighters

11 observed evidence of vandalism and a broken bathroom window that could have

12 provided access to the residence. The firefighters contacted Lieutenant Tom Oliver, a

13 certified Fire Investigation Technician with the Spokane Fire Department Special

14 Investigations Unit. Lt. Oliver arrived and observed that a person or persons had

15 thrown paint on the kitchen cabinets and flooring and had "keyed" the kitchen

16 appliances. Lt. Oliver contacted the Spokane Police Department, which responded to

17 the scene. Subsequent investigators included a Special Agent with the ATF and an

18 insurance fire investigator.

19         The home was owned by a retired male, identified as F.L., who had allowed a

20 contractor to live in the home while the contractor made repairs and updates to prepare

21 the home for sale. The contractor-tenant, identified as W.B., was working in Arizona

22 at the time of the fire. W.B.'s personal property was in the home at the time of the fire

23 as were cans of paint and materials for remodeling the residence. W.B. remotely

24 accessed the doorbell camera on the residence. He was able to see the firefighters

25 arriving, but the video did not capture any suspects.

26         The Insurance Investigator conducted an independent investigation of the fire

27 and determined that a person or persons had lit the contents of the bedroom closet on

28 fire. The Insurance Investigator eliminated any accidental cause for the fire and

determined that it was the result of arson. The total loss was in excess of $120,000. The Insurance Investigator determined that the fire had been starved of oxygen in the closet. This kept it from spreading and resulted in a smoldering fire that would have started earlier in the morning.

W.B. identified his former girlfriend, Defendant Kimberly Ann Brischle, as the person who was most likely to have started the fire. Defendant lived in Post Falls, Idaho, and crossed state lines into the State of Washington in order to start the fire. W.B. had known Defendant for approximately four years. W.B. had previously obtained a restraining order against Defendant that expired in March of 2020. W.B. and Defendant began talking after the order expired. On January 31, 2021, W.B. reported an act of vandalism at 3111 E. 44th where the arson later occurred. W.B. reported that the tires on a trailer that he kept in his yard had been slashed and that a lightbulb over his back door had been broken. Defendant had left a lengthy "break-up" note on his backdoor. Defendant also sent W.B. a text stating, "I left a note on your door. Goodbye [W.B.]." Sometime later, W.B. again terminated his relationship with Defendant. W.B. reported that Defendant had been repeatedly texting and calling his phone and making veiled threats and that he had ignored these or hung up on her. W.B. said that Defendant often used a phone application that allowed her to conceal the device that she was using to contact him. He said that he was in Arizona the night before the fire and began receiving texts from an anonymous number that said, "Tick tock, tick tock."

Specifically, on April 27, 2021, W.B. received the following series of text messages:

Tick

Tick

Tock

Tick

Tock

1    LMAO

2    TICK

3    TOCK

4    LMAO

5    Tick

6    Tock

7    LMAO

8    In everday you're a perfect example of a LOSER!

9    IN EVERYWAY YOURE A PERFECT EXAMPLE OF A LOSER!

10   How perfect this all is. I have waited for a long time t o get to this
11   point. It's all in the timing LMAO

12   You should be able to come up with some lies to tell so you can get
13   back to Spokane. Bummer if you don't

14   It could be this week? Maybe next month? Who knows when???

15         Although no suspects were visible on the video from W.B.'s doorbell camera, a

16   neighbor's "Ring" doorbell camera captured video of a suspicious person walking

17   toward W.B.'s residence and 7:55 am and then running from the direction of W.B.'s

18   residence at 8:25 am. The suspect on the video is a blond woman whose appearance is

19   consistent with Defendant.

20         After the fire, W.B. reported that Defendant had continued to text and call him.

21   In one call, Defendant told W.B., "sorry about your house." W.B. hung up on

22   Defendant and expressed fear that Defendant might attempt further action against him

23   or his dog. On May 6, 2021, W.B. reported to Spokane Police that Defendant had

24   driven her Subaru Legacy into his driveway as if she was going to hit his truck. When

25   W.B. attempted to take a picture of this with his phone, Defendant backed out of the

26   driveway and held up her middle finger. Spokane Police Officer Jared Keller and

27   other patrol officers responded and located Defendant. Ofc. Keller conducted a traffic

28   stop during which he seized Defendant's phone with an intent of obtaining a search

1    warrant for it. On the same date, SPD Detective Dion Mason met with W.B. and

2    helped him complete paperwork for a new restraining order against Defendant. W.B.

3    reported that even after Defendant's phone was seized, she continued to text him. The

4    number associated with the text was incomplete, which was similar to other text

5    messages that had been received on W.B.'s phone. One of the text's sent after

6    Defendant drove into W.B.'s driveway said, "Hey dumb fuck take all the pictures you

7    want of me I wasn't doing anything wrong OMG you looked pathetic here a 6'4" man

8    is scared of me I can understand now why you always have your curtains closed and

9    you are always looking over your shoulder….." W.B. explained that Defendant's past

10   conduct included putting a hidden camera in his bedroom without his permission and

11   sending screenshots to one of him employers to cause him harm or embarrassment.

12   Among the messages from incomplete phone numbers received by W.B. on May 4

13   and 5 were the following:

14           I would let you stay at my place, but you don't even know that I have
15           a place. It wasn't important enough for you to know

16           You ignoring me doesn't bother me, it just gives me more reason to
17           do the things that I do [emoji smiley faces]

18           You motivate the shit out of me. It's fucking awesome!!!

19           I hate you

20

21           For the four years you had fun now next 4 years I'm going to have
22           fun.

23           W.B. also received repeated phone contacts from Defendant and anonymized

24   numbers, including 42 calls in a 25-minute period on May 3, 2021, out of a total of 53

25   contacts by phone and text message from Defendant and shielded numbers occurring

26   that day. On May 4, 2021, W.B. received 24 calls in a twelve-minute period, out of a

27   total of approximately 66 contacts by phone and text message from Defendant and

28

1   shielded numbers occurring that day. On May 5, 2021, W.B. received 30 contacts by
2   phone and text message from Defendant and shielded numbers.

3        The ATF obtained a search warrant for Defendant's cell phone, which was
4   served on May 17, 2021. This search provided additional evidence that Defendant was
5   communicating via unmasked text message with W.B. However, many more masked
6   messages not found on Defendant's phone were found during a consensual search of
7   W.B.'s phone. W.B.'s contact number was stored in Defendant's phone as "Shithead."
8   Some of these messages (and later messages) referenced W.B. as "Buckzona" and "Sir
9   Gaylord," both of which were nicknames that Defendant called W.B .

10        On May 12, 2021, a Washington State no-contact order was obtained against
11   Defendant, which was served on Defendant in Post Falls on May 21, 2021. On the
12   same day, W.B. contacted the ATF and reported that Defendant was sending him
13   additional text messages in violation of the no-contact order.

14        In early June, a follow-up federal search warrant was obtained in the District of
15   Idaho for Defendant's person, vehicle, and residence. The warrant for Defendant's
16   residence was served at a mobile home located in Post Falls, Idaho. The mobile home
17   was the residence of Defendant's cousin, with whom Defendant was periodically
18   living. During the search, agents seized boots and jeans similar to clothing worn by
19   the suspect in the Ring video, four additional cell phones, and a note similar to other
20   notes, emails, and texts received by W.B. During the service of these warrants, an
21   ATF agent attempted to interview Defendant. Defendant denied starting the fire in
22   W.B.'s home but admitted to slashing W.B.'s tires on a prior occasion. Defendant
23   admitted to many of the texts and emails and that she had used an anonymizer
24   application to avoid W.B. from blocking her calls. She admitted to using the
25   nicknames Sir Gaylord and Buckzona that appear in some of the text messages
26   received by W.B. She also admitted to concealing a video camera in W.B.'s bedroom
27   and emailing edited video to other persons claiming that it showed W.B. having sex
28   with his dog.

Plea Agreement - 9

A further federal search warrant was obtained in Idaho on June 21, 2021, for the four phones that were seized during the search of the Defendant's cousin's mobile home. One of the phones was a replacement phone that contained relevant messages and internet searches for W.B. as well as contacts with W.B. after the no-contact order was served on Defendant. Another phone was a "work" phone that contained messages and other relevant material similar to what was on Defendant's replacement phone, including internet searches for W.B.

Relevant location data was also recovered from the search of Defendant's original cell phone. These showed that Defendant accessed the internet from her cell phone while at the Northern Quest Casino at 7:20 am on the morning of the arson fire. Defendant later used her phone to access the internet at approximately 10:00 a.m. at her place of employment in Post Falls. According to the investigating ATF agent, this would have given her time to commit the arson and would have placed her in proximity to it. W.B.'s address is on the South Hill at a location approximately 10 minutes south of I-90. Location data from Defendant's phone showed that she accessed the internet on numerous occasions prior to the arson fire from a parking lot that has a view of 44th Avenue to W.B.'s driveway.

Despite the Washington State no-contact order, W.B. continued to receive harassing and threatening text messages and emails from Defendant until shortly before Defendant's indictment on July 20, 2021. On June 17, 2021, W.B. received the following email from Defendant using an email address assigned to blondedge:

> INo matter what your address is Karma will be knocking on your door. Hell ya. I paid someone $40,000 to make sure of it. They got half the money up front and they will get the rest once they knock on your door. I won't be here to see the fun that happens to you. Darn it. They have 5 years to do the deed. Ha ha
>
> No this is not a threat. It's a promise by Kimberly Ann Brischle
>
> I hope they cut your tongue out for lying or cut your balls off. Your led around by your dick they should cut  your dick off.

The next day, June 18, 2021, W.B. received a further email from blondedge that included the following:

> I'm pretty sure my friend will want to get the rest of the $40000and he will get it once he takes care of you
> Oh don't worry he won't kill you. He will torture you. Winning that money at the casino has made it so easy for me to spend it on you.
> You deserve to be thanked by me
>
> I just wish that I would be here to see him torture you.
>
> You should move out of the country but who knows he probably will still find you. Ha ha the things people will do for money.
>
> Oh I told him to kill your dog too. So you can't fuck the dog no more. The poor dog needs away from you

Later on June 18, 2021, W.B. received a follow-up email from brischlevs[W.B.]:

> I just talked to my friend. He will give you the choice of what you want done to you he will say you can have your tongue cut out or your balls cut off that's what the choices will be and your dog will be killed not worries you have 5 years to think about this or maybe not it could be tomorrow it could be 5 years from now but it will be done to you cuz he needs money

On June 21, 2021, W.B. received the following text message from Defendant using an anonymized number:

> Anytime somebody does a search on you on the internet they will see your greatest hit video. You still have your balls? One day you won't LOL.

Defendant's communications with W.B. in violation of the state-issued no-contact order ended following Defendant's arrest on this matter on July 20, 2021.

7.      The United States Agrees:

(a)      Dismissal(s):

At the time of sentencing, the United States agrees to move to dismiss Count 3 of the Superseding Indictment charging Defendant with Use of Fire in the Commission of a Federal Felony Offense, in violation of 18 U.S.C. § 844(h).

(b)      Not to File Additional Charges:

The United States Attorney's Office for the Eastern District of Washington agrees not to bring any additional charges against Defendant based upon information in its possession at the time of this Plea Agreement and arising out of Defendant's conduct involving illegal activity charged in this Superseding Indictment, unless Defendant breaches this Plea Agreement any time before or after sentencing.

8.      United States Sentencing Guideline Calculations:

Defendant understands and acknowledges that the United States Sentencing Guidelines (hereinafter "USSG") are applicable to this case and that the Court will determine Defendant's applicable sentencing guideline range at the time of sentencing.

(a)      Base Offense Level:

The United States and Defendant have made no agreement and make no representations as to the Base Offense Level applicable to this case, which shall be determined after the Presentence Investigative Report is completed.

(b)      Specific Offense Characteristics:

The United States and Defendant have made no agreement and make no representations as to any Specific Offense Characteristics that may apply to this case, which shall be determined after the Presentence Investigative Report is completed.

(c)      Acceptance of Responsibility:

If Defendant pleads guilty and demonstrates a recognition and an affirmative acceptance of personal responsibility for the criminal conduct; provides complete and accurate information during the sentencing process; does not commit any further obstructive conduct; accepts this Plea Agreement; and enters a guilty plea no later

than February 8, 2022, the United States will move for a three (3) level downward adjustment in the offense level for Defendant's timely acceptance of responsibility, pursuant to USSG §3E1.1(a) and (b).

Defendant and the United States agree that the United States may at its option and upon written notice to Defendant, not recommend a three (3) level downward reduction for acceptance of responsibility if, prior to the imposition of sentence, Defendant is charged or convicted of any criminal offense whatsoever or if Defendant tests positive for any controlled substance.

(d)    <u>Criminal History</u>:

The United States and Defendant have made no agreement and make no representations as to the criminal history category, which shall be determined by the Court after review of the Presentence Report.

9.    <u>Length of Imprisonment</u>:

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), Defendant and the United States agree to recommend a term of imprisonment of 30 months. If the Court rejects the Plea Agreement pursuant to Fed. R. Crim. P. 11(c)(5), the Defendant and the United States agree that they each may withdraw from the Plea Agreement.  If the Defendant withdraws from the Plea Agreement, the Defendant may withdraw Defendant's pleas of guilty.  If the United States withdraws from the Plea Agreement, the United States may prosecute the Defendant for any and all criminal conduct involving or relating to the underlying facts and circumstances of this case.

10.    <u>Criminal Fine</u>:

The United States and Defendant are free to make whatever recommendation concerning the imposition of a criminal fine that they believe is appropriate.

11.    <u>Restitution</u>:

The parties herby stipulate and agree that, pursuant to 18 U.S.C. §§ 3663, 3663A and 3664, the Court shall order full restitution, as appropriate, to any entity, organization, insurance company, individual(s), and/or medical provider who

provided indemnity payments, medical services, and/or funds related to any property damage or treatment of the victim(s).

With respect to restitution, the United States and the Defendant agree to the following: $176,104.99 to State Farm Insurance; $3,884.00 to Floyd Lee.

(a)    Payments

The parties agree the Court will set a restitution payment schedule based on Defendant's financial circumstances. *See* 18 U.S.C. § 3664(f)(2), (3)(A). That being said, Defendant agrees to pay not less than 10% of her net monthly income toward her restitution obligation.

(b)    Treasury Offset Program and Collection

Defendant understands the Treasury Offset Program (TOP) collects delinquent debts owed to federal agencies. If applicable, the TOP may take part or all of Defendant's federal tax refund, federal retirement benefits, or other federal benefits and apply these monies to Defendant's restitution obligations. *See* 26 U.S.C. § 6402(d); 31 U.S.C. § 3720A; 31 U.S.C. § 3716.

Defendant also understands the United States may, notwithstanding the Court-imposed payment schedule, pursue other avenues to ensure the restitution obligation is satisfied, including, but not limited to, garnishment of available funds, wages, or assets. *See* 18 U.S.C. §§ 3572, 3613, and 3664(m). Nothing in this acknowledgment shall be construed to limit Defendant's ability to assert any specifically identified exemptions as provided by law, except as set forth in this Plea Agreement.

(c)    Notifications

The Defendant agrees to notify the Court and the United States of any material change in her economic circumstances (e.g., inheritances, monetary gifts, changed employment, or income increases) that might affect her ability to pay restitution. *See* 18 U.S.C. § 3664(k). This obligation ceases when the restitution is paid-in-full.

The Defendant agrees to notify the United States of any address change within 30 days of that change. *See* 18 U.S.C. § 3612(b)(1)(F). This obligation ceases when

the restitution is paid-in-full.

12.   Supervised Release:

The parties agree to recommend that the Court impose a 3-year term of supervised release to include the following special conditions, in addition to the standard conditions of supervised release:

a) that Defendant participate in mental health treatment programs as the Probation Officer directs; and

b) that Defendant's person, residence, office, vehicle, and belongings are subject to search at the direction of the Probation Officer.

13.   Mandatory Special Penalty Assessment:

Defendant agrees to pay the $200 mandatory special penalty assessment ($100 for each Count) to the Clerk of Court for the Eastern District of Washington, at or before sentencing, pursuant to 18 U.S.C. § 3013 and shall provide a receipt from the Clerk to the United States before sentencing as proof of this payment.

14.   Additional Violations of Law Can Void Plea Agreement:

Defendant and the United States agree that the United States may at its option and upon written notice to Defendant, withdraw from this Plea Agreement or modify its recommendation for sentence if, prior to the imposition of sentence, Defendant is charged or convicted of any criminal offense whatsoever or if Defendant tests positive for any controlled substance.

15.   Appeal Rights:

In return for the concessions that the United States has made in this Plea Agreement, Defendant agrees to waive Defendant's right to appeal the convictions and sentence if the Court imposes a term of imprisonment pursuant to the terms of this Rule 11(c)(1)(C) plea agreement.

If the Court sentences Defendant outside the Rule 11(c)(1)(C) and Defendant chooses not to withdraw the following applies: Defendant agrees to waive Defendant's right to appeal the conviction and sentence if the Court imposes a prison

term no higher than the high end of the applicable guideline range as determined by the Court and imposes no more than 3 years supervised release.  If the Court imposes a sentence higher than the high end of the applicable guideline range and/or greater than 3 years of supervised release, Defendant may appeal only the substantive reasonableness of Defendant's sentence.

Defendant further expressly, waives Defendant's right to file any post-conviction motion attacking Defendant's conviction and sentence, including a motion pursuant to 28 U.S.C. § 2255, except one based upon ineffective assistance of counsel, based on information not now known by Defendant and which, in the exercise of due diligence, could not be known by Defendant by the time the Court imposes the sentence. Should Defendant successfully move to withdraw from this Plea Agreement or should Defendant's conviction on the Superseding Indictment be dismissed, set aside, vacated, or reversed, this Plea Agreement shall become null and void; the United States may move to reinstate the Superseding Indictment No. 2:21-CR-0093-RMP; and the United States may prosecute Defendant on all available charges involving or arising from Defendant's participation in criminal conduct under federal law.  Nothing in this Plea Agreement shall preclude the United States from opposing any post-conviction motion for a reduction of sentence or other attack of the conviction or sentence, including, but not limited to, proceedings pursuant to 28 U.S.C. § 2255 (writ of habeas corpus).

16.    Integration Clause:

The United States and Defendant acknowledge that this document constitutes the entire Plea Agreement between the United States and Defendant, and no other promises, agreements, or conditions exist between the United States and Defendant concerning the resolution of the case.  This Plea Agreement is binding only upon the United States Attorney's Office for the Eastern District of Washington, and cannot bind other federal, state or local authorities.  The United States and Defendant agree

that this agreement cannot be modified except in a writing that is signed by the United States and Defendant.

17.    <u>Waiver of Attorneys' Fees and Costs</u>:

Defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105- 119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations (including without limitation any charges to be dismissed pursuant to this plea agreement and any charges previously dismissed).


<u>Approvals and Signatures</u>

Agreed and submitted on behalf of the United States Attorney's Office for the Eastern District of Washington.


Vanessa R. Waldref
United States Attorney

_____          2/7/22
Timothy J. Ohms                  Date
Assistant U.S. Attorney


I have read this Plea Agreement and have carefully reviewed and discussed every part of the agreement with my attorney. I understand and voluntarily enter into this Plea Agreement. Furthermore, I have consulted with my attorney about my rights, I understand those rights, and I am satisfied with the representation of my attorney in this case. No other promises or inducements have been made to me, other than those contained in this Plea Agreement and no one has threatened or forced me in

any way to enter into this Plea Agreement. I am agreeing to plead guilty because I am guilty.

Kimberly Ann Brischle
Defendant

2-07-22
Date

I have read the Plea Agreement and have discussed the contents of the agreement with my client. The Plea Agreement accurately and completely sets forth the entirety of the agreement between the parties. I concur in my client's decision to Plead guilty as set forth in the Plea Agreement. There is no legal reason why the Court should not accept Defendant's guilty plea.

Amy H. Rubin    / J. Stephen Roberts, Jr.    Date
Attorney for Defendant

2/7/2022

Plea Agreement - 18